UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

---

The B.F. Goodrich Company and Rosemount Aerospace, Inc.,

Plaintiffs,

v.

Auxitrol S.A. and Esterline Technologies Corporation,

Defendants.

Civ. File No. 00-43 (MJD/JGL)

**MEMORANDUM AND ORDER**

---

This matter is before the Court on (1) Plaintiff's Motion for Default Judgment and Defendant's Cross-Motion to Vacate Clerk's Entry of Default; and (2) Defendant's Motion to Dismiss for lack of personal jurisdiction or Transfer Venue.

**BACKGROUND**

Plaintiff Rosemount Aerospace, Inc. ("Rosemount") is a Minnesota-based company that manufactures temperature sensors for airplanes. Rosemount is wholly owned by The B.F. Goodrich Company ("BFG"). On April 11, 1995, Rosemount obtained federal Trademark Registration No. 1,888,236 protecting the external appearance of its model 102 total air temperature sensor. This design has been well known in the aviation industry and synonymous with reliability for over 30 years. Defendant Auxitrol S. A. ("Auxitrol") is a French corporation headquartered in Saint-Cloud, France. Auxitrol is wholly owned by Esterline Technologies Corporation ("Esterline") which is headquartered in Bellevue,

FILED ______
RICHARD D. SLETTEN, CLERK
JUDGMENT ENTD______
DEPUTY CLERK______

Washington. Auxitrol is a global corporation, manufacturing and supplying aircraft-engine parts for the world's major airlines and aircraft manufacturers, including Northwest Airlines of Eagan, Minnesota.

In the underlying Complaint for trade dress infringement, Plaintiffs allege that Auxitrol began marketing its own total air temperature probe, specifically designed to copy and compete with Rosemount's sensor. Plaintiffs assert that Auxitrol directly extrapolated the body of the Auxitrol probe from Rosemount's probe. Rosemount claims that Auxitrol admitted to extrapolating the design because it was convenient to have customers associate the design of Auxitrol's probe with Rosemount's well-known design. Plaintiffs assert that Auxitrol personally marketed the copycat product to Honeywell, Inc., which has aircraft component divisions located in Minnesota.

On January 10, 2000, Plaintiffs filed the underlying Complaint against Defendants for infringement of federal Trademark Registration No. 1,888,236 for a design for a total air temperature sensor ("TAT sensor") used on aircraft and related claims. Thereafter, according to Plaintiffs, Defendants began a long campaign to delay progress in this action, and it is on these delays that Plaintiffs base its Motion for Default Judgment. Defendants deny that they delayed the action as Plaintiffs have portrayed, and move the Court to vacate the clerk's entry of default. Defendants also bring a separate Motion to Dismiss for lack of personal jurisdiction, or alternatively, Transfer Venue.

According to Plaintiffs, the parties agreed that a responsive pleading to the Complaint

was due on May 2, 2000. That date was extended to May 9, 2000. On May 9, 2000, Defendants filed a motion to dismiss for lack of personal jurisdiction. In response, Plaintiffs demanded discovery on the issue of whether Esterline and Auxitrol had sufficient minimum contacts with the State of Minnesota to support jurisdiction. Plaintiffs and Defendants offer different versions of what happened next.

Defendants assert that they permitted Plaintiffs some discovery instead of immediately pursuing the Motion to Dismiss. Plaintiffs assert that its investigation was met with repeated delays and obstruction, culminating in its first Motion to Compel in August 2000. Plaintiffs assert that Defendants' Motion to Dismiss was withdrawn on September 27, 2000, because the Court was concerned about the lengthy pendency of the motion. Defendants assert that it withdrew the motion at the Court's request because of Plaintiff's protracted one-year discovery war, but reserved their right to renew the motion when jurisdictional discovery was complete. On December 21, 2001, this Court granted Plaintiffs' second Motion to Compel, ruling that the withheld documents were relevant to the issue of personal jurisdiction over Defendants.

On March 30, 2001, Plaintiffs announced that jurisdictional discovery was completed. The parties' again disagree over what happened next. Defendants assert that Plaintiffs expected them to re-serve their motion papers immediately. According to Plaintiffs, Defendants requested that the date be extended to the week of April 23, citing counsel's need to study for the patent bar. Two weeks after this agreed upon time, on May 10, 2001,

Defendants requested an extension to May 25, 2001, to which the Plaintiffs agreed. On May 29, 2001, Defendants requested another extension by email. Plaintiffs asserted that counsel merely "alluded" to minor surgery. Defendants assert that Mr. Meiklejohn asked Plaintiffs to accommodate a short two-week extension so that he could undergo minor surgery on May 30 and recover at home. On June 1, 2001, Plaintiffs requested Entry of Default Judgment, and the Clerk of Court for the United States District Court, District of Minnesota entered Default against Defendants.

**DISCUSSION**

1. Default Judgment

The Clerk shall enter a party's default "[w]hen a party against whom a judgment for affirmative relief is sought has failed to plead or otherwise defend as provided by these rules..." Fed. R. Civ. P. 55(a). The Court may set aside an entry of default "[f]or good cause shown." Fed. R. Civ. P. 55(c). Relief from the clerk's entry of default is a more lenient standard than relief from a court's default judgment. Johnson v. Dayton Elec. Mfg. Co., 140 F.3d 781, 783 (8th Cir. 1998). Indeed, there is a judicial preference for adjudication on the merits. Id. at 784 (quotation omitted). The factors to consider in determining whether to set aside the Clerk's entry of default include (1) the culpability of defaulting party; (2) the existence of a meritorious defense, and (3) prejudice to the other party. Id.

In this case, based on the facts related above, Plaintiffs assert that Defendants are culpable, as they have repeatedly attempted to delay progress in this litigation. Plaintiffs

assert that Defendants have taken no action to defend themselves or file responsive pleading in this litigation. Plaintiffs assert that they have been prejudiced because Defendants' delays have prevented them from acquiring "incontestable" status in their federal trademark registration, as such status cannot be granted while "there is a proceeding involving said rights pending...in a court." 15 U.S.C. § 1065(2). Plaintiffs assert that because the factual allegations of the complaint are taken as true if Defendants are found to be in default, Plaintiffs are entitled to recover attorneys' fees and expenses in this matter.

Defendants assert that they have good cause for setting aside the Clerk's entry of default. Defendants first assert that the Court lacks personal jurisdiction over them, so it would be futile to let the judgment stand. Defendants next assert that they have vigorously defended themselves in this matter, as evidenced by their Motion to Dismiss and opposition to what they believe has been Plaintiffs' far-reaching discovery requests. Defendants argue that the one-month delay from May 25, 2001, to June 29, 2001, when they ultimately re-served the Motion to Dismiss, does not constitute a failure to otherwise defend this suit. Defendants explain that Plaintiffs' discovery requests and new theory of jurisdiction based on Defendants' subsidiaries made it necessary to revise its previous Motion to Dismiss.

Defendants also argue that default judgment is an extreme remedy that should only be used when there is a clear record of delay or contumacious conduct. Defendants note that Plaintiffs are not seriously prejudiced by the one-month delay, and that any other delay is caused by Plaintiffs' own decision to engage in jurisdictional discovery. Defendants also

note that for reasons known only to Plaintiffs, they chose to file this lawsuit in January of 2000 instead of waiting until their mark acquired incontestable status in April 2000. Finally, Defendants claim to have a meritorious defense in that their total air temperature probe is sufficiently different from Plaintiffs'.

The Court finds that Defendants have not exhibited the type of behavior necessary to warrant a default judgment. Defendants have presented a meritorious defense–surgery–of what might otherwise appear to be, as Plaintiffs' put it, "the straw that broke the camel's back." Furthermore, the Court fails to see how Plaintiffs are or would be prejudiced by going forward with the litigation they commenced, particularly since the Court has been receptive to their extensive and time-consuming discovery requests on jurisdiction. This Court also recognizes the time demands on experienced litigation attorneys, and encourages the parties to resolve communication issues and continue to accommodate one another's schedule.

2. Personal Jurisdiction

Defendants move to dismiss the underlying action for lack of personal jurisdiction pursuant to Federal Rules of Civil Procedure, Rule 12(b)(2). To defeat a motion to dismiss for lack of personal jurisdiction, the nonmoving party must make a prima facie showing of jurisdiction. Dakota Indus., Inc. v. Dakota Sportswear, Inc., 946 F.2d 1384, 1387 (8th Cir. 1991).

A federal court must undergo a two-step inquiry when determining whether it has jurisdiction over a non-resident party: (1) whether the facts presented satisfy the forum

state's long-arm statute, and (2) whether the non-resident has minimum contacts with the forum state, so that the court's exercise of jurisdiction would be fair and in accordance with due process." Soo Line R.R. Co. v. Hawker Siddeley Canada, Inc., 950 F.2d 526, 528 (8th Cir. 1991). The inquiry collapses into a single question of whether the exercise of personal jurisdiction comports with due process, when a state construes its long-arm statute to confer jurisdiction to the fullest extent permitted by the due process clause. Bell Paper Box, Inc. v. U.S. Kinds, Inc., 22 F.3d 816, 818 (8th Cir. 1994). Minnesota has construed its long-arm statute to have the maximum extraterritorial effect allowed under the due process clause. Valspar Corp. v. Lukken Color Corp., 495 N.W.2d 408, 410-411 (Minn. 1992).

The due process clause requires that there be "minimum contacts" between the defendant and the forum state before the forum state may exercise jurisdiction over the defendant. World-Wide Volkswagen Corp. v. Woodson, 444 U.S. 286, 291 (1980). The "minimum contacts" requirement will be satisfied if the defendant's conduct and connection with the forum state is such that the defendant should reasonably anticipate being haled into the forum state's court. World-Wide, at 291. Furthermore, the maintenance of the suit in the forum state must not offend traditional notions of fair play and substantial justice. International Shoe Co. v. Washington, 326 U.S. 310, 316 (1945)(citations omitted).

Where the plaintiff's claims arise out of, or are connected with, the defendant's activities in the forum state, maintenance of the action generally does not offend "traditional notions of fair play and substantial justice." Morris v. Barkbusters, Inc., 923 F.2d 1277,

1280 (8th Cir. 1991)(citation omitted).

When a defendant challenges jurisdiction, the burden is on the plaintiff to prove the minimum contacts necessary to satisfy due process. Hardrives, Inc. v. City of LaCrosse, Wisconsin, 240 N.W.2d 814, 816 (Minn. 1976). See also, Newhard, Cook & Co. v. Inspired Life Ctr, Inc., 895 F.2d 1226, 1228 (8th Cir. 1990). "At the pre-trial stage, however, the plaintiff need only make a prima facie showing of sufficient Minnesota-related activities through the complaint and supporting evidence, which will be taken as true." Hardrives, 240 N.W.2d at 816. Furthermore, doubts should be resolved in favor of jurisdiction. Id.; Viking Eng'g & Dev., Inc. v. R.S.B. Enter., Inc., 608 N.W.2d 166, 169 (Minn. Ct. App. 2000).

In this case, Defendants argue that Esterline has never had any direct contact with Minnesota and has never sold anything to Minnesota residents. Defendants admit that Auxitrol buys some parts from one Minnesota company, and has sold some parts to Minnesota companies from time to time, but argues that it has never sold the accused device in Minnesota.

Plaintiffs assert that specific jurisdiction is proper under the "effects test," as Auxitrol committed an intentional tort by infringing the trade dress of its temperature sensor probes, knowing that the injury would be felt in Minnesota. See Janel Russell Designs, Inc. v. Mendelson & Assoc., Inc., 114 F. Supp.2d 856 (D. Minn. 2000); see also Calder v. Jones, 465 U.S. 783, 788-90 (1984); Dakota Indus., 946 F.2d at 1390-91; Janmark, Inc. v. Reidy, 132 F.3d 1200 (7th Cir. 1997). Plaintiffs assert that specific jurisdiction is also proper as to

Esterline, acting through the actions of its subsidiary and agent, Auxitrol. See Minn. Stat. § 543.19. The Court agrees.

As in Janel Russell, Defendant Auxitrol's contacts with Minnesota are thin, but sufficient under the circumstances to support a prima facie showing of personal jurisdiction. Although there is no evidence that any of the alleged infringing product was shipped to Minnesota, the Court gives this evidence the proper weight it deserves in light of the facts of this case. Plaintiff acted promptly to commence the underlying suit before Defendants ever sold the alleged infringing product anywhere in the United States.

Nevertheless, Plaintiffs have presented evidence that Auxitrol marketed the alleged infringing product directly to Honeywell in early 1999, when it was still headquartered in Minnesota. Auxitrol presented its TAT sensor on two separate occasions. One presentation took place in Phoenix, Arizona, and according to Plaintiffs, Auxitrol cannot remember where the other presentation took place. Additionally, Honeywell's then Minneapolis-based headquarters dictated the terms under which Auxitrol could do business with it, such as ethical guidelines for dealing with suppliers, respect for the intellectual property of others, limitations on gifts, and other restrictions. Finally, Honeywell still maintains facilities in Minnesota, including a facility in Coon Rapids, for sensor products such as the product at issue in this case.

Plaintiffs have also presented evidence that Auxitrol promotes, markets, and advertises the infringing product in brochures that list Northwest Airlines, a Minnesota-based

airline, among Auxitrol's worldwide customers, and that Northwest Airlines is included on Auxitrol's mailing list. Accordingly, based on Auxitrol's contacts with two major Minnesota corporations, Auxitrol may fairly be said to have purposefully availed itself of the privilege of conducting activities in the forum state, such that it could reasonably anticipate being haled into court here. Plaintiffs' claims of trade dress infringement is related to these contacts. Accordingly, the Court's exercise of jurisdiction in this case does not offend due process. See Morris, 923 F.2d at 1280.

Moreover, Plaintiffs have presented evidence that Auxitrol intentionally copied the design of Rosemount's temperature sensor probe, knowing that Rosemount was a resident of Minnesota. Auxitrol's product proposal written to the French military indicates that the Auxitrol probe is directly derived from the Rosemount probe. (Bernard Depo., Ex. 15 ("La définition du corps de la sonde civile est donc directement extrapolée de la sonde americaine.").) Plaintiffs have presented evidence that Auxitrol's motivation for copying the design was for commercial convenience and to create greater customer confidence through the customer's familiarity with the Rosemount probe. (Id. at 165, ll 18-25; 167, ll 1-8; 168 ll 1-13.) Plaintiffs also presented evidence that Auxitrol knew that Minnesota-based Rosemount was the leading sensor maker by 1994. Plaintiffs presented evidence that Auxitrol had technical drawings from its files that originated from Rosemount, showed the design at issue, and stated that Rosemount is located in Minnesota. Finally, Plaintiffs presented evidence that Auxitrol possessed copies of a Rosemount temperature probe patent

when it developed the probes, and that the patent states that Rosemount is located in Minnesota. Thus, as the court in Janel Russell points out, Auixtrol has a closer relationship with this forum than a defendant charged with "mere untargeted negligence." 114 F. Supp.2d at 862 (citing Calder, 465 U.S. at 788-89; Dakota Indus., 946 F.2d at 1390-91). The "effects test" reasoning applied in Calder and Dakota Industries also applies here, in the context of a trade dress infringement case. Because Rosemount is a resident of Minnesota, Auxitrol could reasonably anticipate that the injury would be felt here.

Viewing the facts in the light most favorable to Plaintiffs, and resolving all doubts in favor of jurisdiction, the Court concludes that Plaintiffs have established their prima facie showing of personal jurisdiction, and therefore, Defendants' motion to dismiss is denied.

3. Transfer

Defendants argue in the alternative that this matter should be transferred to the United States District Court for the Western District of Washington, where it filed a declaratory judgment action against The B.F. Goodrich Company and Rosemount, the same parties in this case, seeking a declaration that the accused device does not infringe Rosemount's alleged mark. According to 28 U.S.C. § 1404(a), "[f]or the convenience of the parties and witnesses, in the interest of justice, a district court may transfer any civil action to any other district or division where it might have been brought." Defendants assert that Auxitrol has waived jurisdiction in that court and Esterline is headquartered in Bellevue, Washington, and therefore, there is no jurisdictional question to be resolved. Defendants also argue that

Rosemount's counsel, Merchant and Gould, have offices in Seattle. Finally, Defendants argue that the interest of justice and convenience would be served by allowing both lawsuits to go forward in Washington.

The Court finds that a transfer of this action would merely shift the inconvenience of the forum to Plaintiffs. Norval Indus., Inc. v. Superior Co., 515 F. Supp. 895, 899 (D. Minn. 1991). Defendants have not overcome the judicial preference for permitting Plaintiffs to choose its forum. Hoppe v. G.D. Searle & Co., 683 F. Supp. 1271, 1276 (D. Minn. 1988). Accordingly, Defendants' Motion to Transfer Venue is denied.

Based on all the files, records, and proceedings herein, **IT IS HEREBY ORDERED** that:

1. Plaintiffs' Motion for Default Judgment (Clerk Doc. No. 52) is **DENIED**;
2. Defendants' Motion to Vacate Clerk's Entry of Default (Clerk Doc. No. 56) is **GRANTED**;
3. Defendants' Motion to Dismiss (Clerk Doc. No. 62) is **DENIED**; and
4. Defendants' Motion to Transfer Venue (Clerk Doc. No. 62) is **DENIED**.

Dated: Nov. 30, 2001

Michael J. Davis
United States District Court Judge